**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**FRANCES J. BRINSON,**

      **Plaintiff,**

**vs.**                               **Case No.  4:12-CV-436-WS/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

      This is a Social Security case referred to the undersigned United States

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review

of the final determination of the Commissioner of the Social Security Administration

(SSA) denying Plaintiff's application for Disability Insurance Benefits (DIB).  After careful

consideration of the entire Record, it is respectfully recommended that the decision of

the Commissioner be reversed and remanded for further proceedings.

## I.  Procedural History of the Case

      On December 3, 2008, Plaintiff, Frances J. Brinson, filed a Title II application for

a period of disability and DIB, alleging disability beginning on May 1, 2003, due to lupus,

kidney stones, a left arm injury, and bad nerves.  R. 113-17, 157.  (Citations to the

Record shall be by the symbol "R." followed by a page number that appears in the lower

right corner.)  At hearing, Plaintiff amended her onset date to July 1, 2005.  R. 39.

Plaintiff's date last insured, or the date by which her disability must have commenced in

order to receive benefits under Title II, was June 30, 2009.  R. 18, 119, 131.

Plaintiff's application was denied initially on March 19, 2009, and upon

reconsideration on August 12, 2009.  R. 18, 58-65, 69.  On October 2, 2009, Plaintiff

requested a hearing.  R. 18.  On September 30, 2010, Plaintiff appeared and testified at

a hearing conducted in Tallahassee, Florida, by Administrative Law Judge (ALJ)

Frederick McGrath.  R. 18, 31-56.  Plaintiff was represented by Maureen C. Proctor, an

attorney.  R. 11-12, 18, 57.

On October 19, 2010, the ALJ issued a decision and denied Plaintiff's application

for benefits concluding that Plaintiff was not disabled through June 30, 2009, the date

last insured.  R. 18-25.  On February 17, 2011, Plaintiff requested review of this

decision, which the Appeals Council denied on May 21, 2012.  R. 7-14.  The ALJ's

decision stands as the final decision of the Commissioner.

On August 12, 2012, Plaintiff filed a Complaint with the United States District

Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of

law, docs. 19 and 22, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.  "The claimant last met the insured status requirements of the Social Security
    Act on June 30, 2009."  R. 20.

2.  "The claimant did not engage in substantial gainful activity during the period
    from her amended alleged onset date of July 1, 2005, through her last date
    insured of June 30, 2009."  R. 20.

3. "Through the date last insured, the claimant had the following severe impairments: lupus, residuals of gunshot wound to the right upper extremity, and a history of kidney stones." R. 20. The ALJ also found that Plaintiff's "medically determinable mental impairment of affective disorder and anxiety related disorder, considered singly and in combination, did not cause more than a minimal limitation in the claimant's ability to perform basic mental work activities and were therefore nonsevere." R. 21. In making this finding, the ALJ stated he considered the four broad functional areas, i.e., the paragraph B criteria in Listing 12.00C, and ultimately determined that Plaintiff had no limitation in activities of daily living; mild limitation in social functioning and concentration, persistence or pace; and no episodes of decompensation which have been of extended duration. R. 21.

4. "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 21.

5. "[T]hrough the date last insured, the claimant had the residual functional capacity [RFC] to perform the full range of medium work as defined in 20 CFR 404.1567(c)." R. 22.

6. "Through the date last insured, the claimant was capable of performing past relevant work as a purchasing clerk. This work did not require the performance of work related activities precluded by the claimant's [RFC]." R. 24.

7. The Claimant was not under a disability at any time from July 1, 2005, the amended alleged onset date, through June 30, 2009, the date last insured. R. 25.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual

findings are conclusive if supported by substantial evidence." <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. <u>Moore</u>, 405 F.3d at 1211.[1]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).

---

[1] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

Both the "impairment" and the "inability" must be expected to last not less than 12 months. <u>Barnhart v. Walton</u>, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status. *See* 42 U.S.C. § 423(a)(1)(A) and (d); <u>Torres v. Sec'y of Health & Human Servs.</u>, 845 F.2d 1136, 1137-38 (1st Cir. 1988); <u>Cruz Rivera v. Sec'y of Health & Human Servs.</u>, 818 F.2d 96, 97 (1st Cir. 1986). 42 U.S.C. § 423(d)(1)(A)

> quite clearly requires that it is the impairment only which must last for a continuous period. Normally, of course, when a claimant has an impairment severe enough to prevent him from working, he will be unable to work for as long as the impairment lasts. This is particularly true when the impairment is physical. The statute, however, does not *require* that a claimant be unable to engage in work during the entire 12 month period. *See also* 20 C.F.R. §§ 404.1505(a); 404.1509; 404.1510. The ability of a claimant to engage in work for limited periods of time certainly calls into question the severity of the impairment, but it does not necessarily determine whether the impairment, however, severe, has lasted for at least 12 months.

> While a claimant need only show that an alleged impairment has lasted or can be expected to last for the 12 month period to meet the duration requirement, a claimant alleging a mental impairment may face a difficulty not presented in cases involving physical impairment. As one court has stated,

>> While the mere existence of symptom-free periods may negate a finding of disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of the claim. Unlike a physical impairment, it is extremely difficult to predict the course of mental illness. Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.

> *Lebus v. Harris*, 526 F.Supp. 56, 61 (N.D. Cal. 1981).

> Because of such considerations, the courts which have considered the question have concluded that a claimant whose claim is based on a mental condition does not have to show a 12 month period of impairment unmarred by any symptom-free interval. . . . We agree with the assessment of these courts. A finding that a claimant has a mental impairment which manifests itself from time to time over a

long-term period is not inconsistent with the language of the statute, which requires that an impairment last "for a continuous period of 12 months.". . . . Of course, as required by the regulations, the claimant must present medical evidence which indicates that his mental condition is a long-term problem and not just a temporary setback.

Singletary v. Bowen, 798 F.2d 818, 821-22 (5th Cir. 1986) (citations omitted).  *See*

Lane v. Astrue, No. 1:09CV00159-MP-AK, 2010 U.S. Dist. LEXIS 75846, at *28-30

(N.D. Fla. July 28, 2010) (citing Singletary).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  Consideration

is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is

not disabled.  If the claimant carries this burden, however, the burden shifts to the

Commissioner at step five to establish that despite the claimant's impairments, the

claimant is able to perform other work in the national economy in light of the claimant's

RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear.  20 C.F.R. § 404.1527.  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.  20 C.F.R. § 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This requires a relationship of both

duration and frequency." <u>Doyal v. Barnhart</u>, 331 F.3d 758, 762 (10th Cir. 2003). "'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.' *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)." *Id.*

> As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration." *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)]. Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.
>
> A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. Absent an indication than an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

<u>Doyal</u>, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, <u>Marbury v. Sullivan</u>, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. <u>Phillips</u>, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." <u>MacGregor,</u> 786 F.2d at 1053. The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ

may discount the treating physician's opinion if good cause exists to do so. <u>Hillsman v. Bowen</u>, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." <u>Lewis</u>, 125 F.3d a1436, 1440 (11th Cir. 1997); <u>Edward</u>, 937 F.2d at 583 (citing <u>Schnorr v. Bowen</u>, 816 F.2d 578, 582 (11th Cir. 1987)). Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments. <u>Wheeler v. Heckler</u>, 784 F.2d 1073, 1075 (11th Cir. 1986).

## IV. Legal Analysis

### A. Issues for Determination

Plaintiff argues the ALJ erred when he did not consider Plaintiff's anxiety disorder and Post Traumatic Stress Disorder (PTSD) and, as a result, the ALJ's findings at steps two and three and his credibility determinations are flawed and unsupported by substantial evidence. Doc. 19 at 14. In support, Plaintiff argues that in finding Plaintiff's mental impairments not severe at step two, the ALJ did not to properly consider the contents of the credited opinion from consulting psychologist Dr. Carr and erroneously rejected the opinion of psychiatrist, Dr. Cushman. *Id.* Plaintiff further suggests that the

ALJ's error at step two foreclosed further consideration of the merits of her claim for disability with respect to her former work activities. *Id.*

The Commissioner responds that the ALJ properly determined that Plaintiff was not disabled (as of June 30, 2009, the date last insured) and able to perform past relevant work based on statements made by Plaintiff; the opinions of Dr. Dulay, an independent medical examiner who performed a physical examination of Plaintiff on February 17, 2009; the reports from medical consultants, Drs. Holified (March 10, 2009) and Guttman (July 23, 2009); the reports from consulting psychologists, Drs. Cormier (March 10, 2009) and Peterson (August 12, 2009); and the independent psychological examination performed by Dr. Carr, a psychologist (February 19, 2009). Doc. 22 at 12-17. The Commissioner further argues that the ALJ properly rejected the opinions of Dr. Cushman, a psychiatrist, who "did not begin to see Plaintiff until July 6, 2010, over one year after her insured status had expired (Tr. 540-42)" and "was not obligated to accept Dr. Cushman's September 22, 2010, Mental [RFC] Checklist, or his follow up letter stating that the limitations listed on the checklist had existed since 2005, because he was not treating Plaintiff during the period adjudicated by the ALJ, his treatment postdates Plaintiff's date last insured, and his opinion is speculative at best (Tr. 643-36, 732)." *Id.* at 16-17. The Commissioner concludes that Plaintiff did not prove she could not perform her former work prior to the expiration of her insured status based on "[t]he totality of the evidence." *Id.* at 17.

### B. The Evidence

### 1. Plaintiff's Past Relevant Work

Plaintiff was born on April 4, 1954, and was an individual closely approaching advanced age (age 50-54) at the amended alleged onset date (July 1, 2005) and at her date last insured (June 30, 2009), just several months short of being an individual of advanced age (age 55 or older).  R. 52; 20 C.F.R. § 404.1563 (d) & (e).  Plaintiff has a high school education.  She worked in a hospital from 1993 to 2001 as an administrative secretary and then as a physician's office clerk.  From 2001 to 2002, she was secretary to a hospital department head and from 2002 to 2003, she was a purchasing clerk at the hospital.  Plaintiff worked as a secretary in a law office in 2003.  R. 58, 124-25, 136, 150, 158-59, 166.  Although she worked as a substitute teacher for the Madison County School Board from 2004 to 2006, the ALJ did not find that the earnings from this work rose to the level of substantial gainful activity.  R. 20, 130.

### 2. Evidence Prior to the Date Last Insured of June 30, 2009

On March 3, 2003, patient notes from John Szczesny, M.D., a rheumatologist, indicate that Plaintiff came in for a follow-up of her chronic pain and fibromyalgia. R. 238, 468.[2]  (This note and others that follow indicate at the bottom: Janice Rousseau, PAC for John M. Szczesny, M.D.  R. 234-38, 465-68.)  She was doing better than she had in a good while.  She and her husband were getting along better.  Plaintiff reported pain mainly in her upper back, hands, and calves.  She was taking Xanax and Darvocet twice a day and Soma and Klonopin at bedtime.  Since her last visit, Plaintiff had a left breast implant replacement as the one she had ruptured.  Plaintiff had no knee, ankle,

---

[2]  Plaintiff testified that Dr. Szczesny diagnosed Plaintiff with Lupus in 1986. R. 41.

or joint swelling, but some tenderness along her upper back. Dr. Szczesny's impression was fibromyalgia, chronic pain, and the plan was to have Plaintiff continue with her current medication and return in three months. *Id.*

Plaintiff returned to Dr. Szczesny on August 11, 2003, with a noted history of positive antinuclear antibodies (ANA) and fibromyalgia. R. 237, 467. Overall, she looked like she was doing better, was rested, and not working. She was sleeping well and anxiety level was better. She was taking Zoloft rather than Celexa and cut back on her use of Darvocet to one or two a day, but still took Soma at night, Xanax as needed, but no Klonopin. Plaintiff had no joint swelling in the upper or lower extremities. Dr. Szczesny's impression was positive history of ANA, fibromyalgia, and anxiety. Darvocet was cut from four to two a day and Soma from two to one a day. She needed them during difficult times, but she was doing better. Dr. Szczesny was hopeful that all medications would be discontinued in the future. *Id.*

On November 6, 2003, Plaintiff returned to Dr. Szczesny and was doing well with a cut back on her medication. R. 236, 466. Her home situation was about the same. Since her last visit, Plaintiff was bitten twice on the left hand by a spider. The impression was fibromyalgia, stable. Plaintiff was to continue with her current dose of medication. *Id.*

On April 21, 2004, Dr. Szczesny noted that Plaintiff complained with some urgency of increased right scapular pain and diffuse aches and pains in her legs and arms, but denied any preceding trauma and was otherwise stable. R. 235, 465. She was sleeping well without any change in her lifestyle. The impression was fibromyalgia

with increased scapular pain.   She had full range of motion in the arms and legs and no

rashes or joint swelling.  Dr. Szczesny administered an injection of Marcaine and

Depo-Medrol, which gave Plaintiff some relief of pain before she left the office.  *Id.*  An

April 26, 2004, note indicates that Plaintiff had to go to Texas urgently.  An early refill of

Xanax was approved.   R. 236.

On July 25, 2004, Plaintiff was the victim of an assault during a home invasion.

R. 225-31.  Plaintiff pleaded with her attacker and then reached for her pistol; during a

struggle with her attacker, Plaintiff was shot in the left arm with her own .22 caliber

pistol.  R. 226-27.  Plaintiff was taken to Madison County emergency room and then

transferred to Tallahassee Memorial Hospital where she had surgery to repair the

wound to the left supracondylar, intracondylar humerus fracture.  An exploration of the

left brachial artery was performed with some spasm found, but no apparent injury.

R. 225.  It was noted that Plaintiff was separated from her husband and not working at

the time.  R. 226.

In December 2004 and January 2005, Plaintiff received treatment at the Madison

County Health Department (MCHD) for severe depression and insomnia.  R. 432.

Plaintiff was unable to sleep and reported going through a bad marital situation.  Plaintiff

could not afford Prosom for sleep and was instead prescribed Lexapro for depression

and Phenobarbital or Trazodone for sleep.  *Id.*  It was noted in January 2005 that

Plaintiff was seeing Dr. Szczesny "but no insurance now" and she had no ongoing

provider.  *Id.*

On February 15, 2005, Plaintiff reported to Dr. Szczesny that she still had some

numbness in her first three fingers following the July gunshot wound.  R. 234.  Plaintiff

reported being quite anxious and requested some Xanax. She was taking Lexapro.

She also reported not sleeping well and not having any insurance. It was noted that

Plaintiff could make a full fist with her left hand and her grip was fair. She had about a

30° flexion contracture to the left elbow and minimal soft tissue tenderness. Plaintiff

was continued on Lexapro and given Xanax with two refills and started on Trazodone at

bedtime. Plaintiff reported going through a divorce and was to return in three months.

*Id.*

On April 25, 2005, Plaintiff returned to Dr. Szczesny again for fibromyalgia and a

history of lupus. It appears that Plaintiff was seen by Cheryl Holm, ARNP. R. 233, 234,

464. Plaintiff complained of stress and some panic attacks while going through a

divorce. Plaintiff reported that she stopped taking Trazodone because it caused some

heart palpations; she also stopped taking Lexapro--she was not sure it made much of a

difference, but she got it free of charge through the health department. She had no

health insurance. She requested "something for pain" and sleep. It was noted that

Plaintiff was in no acute distress, her weight was up eight pounds, vital signs were

normal, and she had no edema or acute joint inflammation. Restoril was prescribed for

sleep and Tramadol as needed for pain. This impression was fibromyalgia, history of

lupus and recent stressors. *Id.*

On May 10, 2005, Dr. Szczesny noted that Plaintiff was using Restoril for sleep,

Lexapro for depression, and Tramadol for pain, but not working well and were fairly

expensive.[3] (Only Dr. Szczesny's name appears at the bottom of the patient note.)

R. 232, 463. He noted that Plaintiff had been under a lot of stress, strain, and

depression. Plaintiff and her husband were separated. She had been waiting for her

_____

[3] This is the last reported time Plaintiff was seen by Dr. Szczesny.

husband to come home for five years, but he was now living with another woman.

Multiple medical problems are noted including the following: "Because of the possibility that always seems to come up about her having a possible connective tissue disease I believe because she has had a history of a positive ANA for a long time, but never any real hard findings to confirm that diagnosis." *Id.* Dr. Szczesny opined that Plaintiff had "a chronic underlying depression that is probably more serious than we realize, and certainly more deeply rooted." As a result, he recommended a different therapeutic approach with Lamictal and Wellbutrin for depression and Darvocet as needed for pain. He wanted Plaintiff to "stay active" and that "she take some definite action regarding her marriage and social situation. Otherwise, she is going to find her whole life has gone by and it has been wasted and she will remain one happy mess." R. 232, 463. Plaintiff was to return in two months. Her lab work was to done at the health department. *Id.* Dr. Szczesny noted that Plaintiff "has had a history of a positive ANA for a long time, but never any real hard findings to confirm that diagnosis." *Id.* He also noted that repeating the blood work would not provide a greater understanding of her condition because the laboratory work "has been abnormal in the past to greater or lesser degrees" and he did not believe it would "add much to the understanding of her condition." *Id.*

At Plaintiff's July 2005 follow-up at the MCHD, Trazodone was discontinued due to nightmares and Vistaril was prescribed instead. R. 434. In August 2005, Plaintiff requested Lexapro be prescribed again due to depression. R. 436; *see* R. 436, 438 (September and October 2005 and March 2006 notes). In June 2006, Plaintiff was "doing ok, has joint pain, myalgias from Lupus, not working." R. 438. Amitriptyline was

prescribed for recurrent joint pain and myalgias, and Lexapro and Trazodone were continued.  R. 438, 440.  Plaintiff's prescription for Lexapro was refilled in July 2006.  R. 440.

After falling on her left arm on November 14, 2006, and being seen at the Madison County Hospital emergency department, R. 358-66, an x-ray revealed "numerous 1 mm x 2 mm metallic bullet fragments scattered about the distal left brachium and elbow" with evidence of prior vascular repair, "abundant orthopedic hardware" and mild osteopenia of the left elbow, but no other acute injury or adverse reaction and no evidence of recent trauma.  R. 363; *see* R. 440 (MCHD notes for November 2006).

In March 2007, Plaintiff sought care at the MCHD for left arm neuropathic pain.  Although she was not taking Paxil due to side effects, she was encouraged to restart it for depression, anxiety, and myalgias.  R. 442.  In November 2007, Plaintiff reported doing well taking Paxil three times daily for anxiety, but was instructed to decrease her dosage to twice daily.  R. 446.  Plaintiff was also taking Xanax three times a day for anxiety; it worked well and Plaintiff felt very well, "no SE, no depression or thoughts of suicide."  It was also noted that Plaintiff was "well developed, well nourished, alert and cooperative, pleasant manner, in no acute distress."  R. 444.  Plaintiff had tenderness over her left kidney and a urinalysis indicated blood in her urine.  A kidney stone was suspected.  R. 446.

Plaintiff received general care from the MCHD from January 2008 through November 2008.  R. 374-82 448-54.  In March 2008, Plaintiff reported problems with her right ear and prescribed an antibiotic.  R. 381, 448.  In April 2008, Plaintiff sought

treatment for left arm neuropathic pain with severe cramps at night.  She was prescribed Neurontin and instructed to continue Xanax for anxiety.  R. 380, 452; *see* R. 378-79, 450 (Xanax refilled in July and August 2008); R. 380, 452 (Paxil refilled in June 2008).

In May, July, August, September, and October 2008, Plaintiff received urgent care for kidney stones.  R. 243-53, 262-354, 369-73, 383, 417-29.  During her treatment, Plaintiff had diagnostic CT urograms to determine the location of the stone(s) and then obtained medication for pain and/or nausea.  She was advised to increase her fluid intake and follow a diet that would help to prevent stones.  R. 248, 254, 372.  She again received urgent care for kidney stones in January and February 2009.  R. 486-98, 508-12.

On January 7, 2009, Plaintiff underwent a cystoscopy with right stent placement and ESWL shock wave therapy to break up the kidney stone.  Phenergan was prescribed for nausea.  R. 618-22, 631.  On January 20, 2009, Plaintiff sought treatment for flank pain at Capital Regional Medical Center.  R. 511.  A CT urograms indicated several bilateral non-obstructive renal pelvis calculi measuring up to 8 mm on the right and 2 mm on the left, with no hydronephrosis or hydroureter and no ureteral calculus. R. 508-12.  On January 27, 2009, Plaintiff was noted to still have a kidney stone with proper stent placement.  R. 613.  On February 3, 2009, Plaintiff underwent a lithotripsy treatment to fracture a kidney stone.  R. 610.  On February 6, 2009, Plaintiff was prescribed Demerol for post-procedure pain and on February 10, 2009, Plaintiff was prescribed Lortab for pain.  R. 608-09.  On February 20, 2009, Plaintiff underwent a

cystoscopy with right urethral stent removal.  R. 599-600.  On February 27 and April 24,

2009, Plaintiff received Lortab for kidney stone pain.  R. 595, 596.

In April 2009, Plaintiff again received treatment at the MCHD for myalgias and

anxiety.  R. 456.  It was suggested that she consider restarting Paxil.  Xanax was

continued for anxiety.  *Id.*  On June 12, 2009, Plaintiff received emergency treatment for

kidney stone pain and was given injections of Toradol, Phenergan, Nubain, and

Benadryl for pain and nausea.  R. 721.  On June 16, 2009, Plaintiff received emergency

treatment for kidney stone pain, but signed out against medical advice.  R. 710-15.

### 3. Examining and Non-Examining Physicians and Psychologists Prior to Date Last Insured of June 30, 2009

On February 17, 2009, family practitioner and pediatrician Maria Linda Dulay,

M.D., examined Plaintiff at the Commissioner's request.  R. 384-88.  No medical

records from Plaintiff's doctors were reviewed.  R. 384, 386.  Plaintiff provided Dr. Dulay

with a history of her present illness, which included being under the care of

Dr. Campbell at the MCHD, and Dr. Szczesny, and taking several medications--

Neurontin, Trazodone, and Xanax.  R. 384.  According to Dr. Dulay, Plaintiff reported

being able to lift 20 pounds, was right-handed, could walk a mile, stand for an hour, and

sit for five hours at a time.  R. 384-85.  Plaintiff said she drove, did household chores,

took care of personal needs, and babysat for her grandchildren.  Right hand grip was

5/5 and left hand grip was noted to be 4/5 but good and functional grip, with "fairly good"

coordination overall; her range of motion of the extremities was within normal limits; her

musculoskeletal system was normal; and she had normal reflexes, motor system, and

sensory system.  Plaintiff had no muscular atrophy or hypertrophy in her extremities.

Muscle tone was good.  R. 385-86.  Plaintiff's attention span and concentration were

"fairly good." R. 386. In sum, Dr. Dulay found Plaintiff's examination to be normal with the exception of a left arm scar and breast implants. R. 386. Plaintiff's implants were related to bilateral breast mastectomies with reconstructive surgery, resulting from fibrocystic tissue and a family history of cancer. R. 232, 458, 541.

On February 18, 2009, and at the request of the Commissioner, Plaintiff was examined by Chris Carr, Ph.D., a psychologist. R. 389. Plaintiff told Dr. Carr that her nervous condition increased because her husband had an affair several years ago and her marriage eventually ended in divorce. *Id*. Plaintiff also described a home invasion in 2004, but denied vivid dramatic memories, although she reported having recurrent thoughts about the incident that occurred about once every few weeks. Since the incident, Plaintiff reported not trusting anybody but family members. *Id*. She reported living with her daughter, her daughter's two-year old child, and her ex-mother-in-law due to fear of being alone. She also reported being highly reactive to hearing noises outside that she feared being alone and was anxious about leaving home or being around people. R. 390. Plaintiff informed Dr. Carr that she attempted to work after 2004, but her "nerves couldn't take it." *Id*. Plaintiff said that during the day she took care of her granddaughter while her daughter was at work. *Id*. Plaintiff reported that she cooked lightly and cleaned and also spoke with a friend on the phone a couple times a week and sometimes they got together on Friday nights and went out to eat. *Id*.

Dr. Carr found that Plaintiff's thought process was goal-directed, logical, and organized, with no evidence of a disturbance. R. 391. Plaintiff did not demonstrate evidence of delusions, perceptual abnormalities, hallucinations, or suicidal or homicidal thoughts. *Id*. Her speech was normal, articulation was good, and there was no

pressure. *Id.* Her sleep and appetite were good. On memory and concentration testing, Dr. Carr reported that Plaintiff was able to recall three objects immediately, spell the word "world" backwards, and complete serial sevens by counting backwards from 100 in intervals of seven. *Id.*

Dr. Carr noted that Plaintiff took Xanax three times a day for anxiety. R. 392. Dr. Carr reported that Plaintiff described a period of depression, which subsided after a few years, but that she remained anxious, with symptoms of PTSD. *Id.* Dr. Carr indicated that Plaintiff's hypervigilance was quite serious, but her other symptoms were moderate. *Id.* Plaintiff feared bad things happening to her or her family members and she feared being around strangers. *Id.* Dr. Carr diagnosed PTSD and indicated that Plaintiff was likely to need continuing psychiatric treatment. Plaintiff was able to manage her own benefits. *Id.*

On March 10, 2009, Jane Cormier, Ph.D., reviewed the evidence of record, including Dr. Carr's report of examination, R. 414, and completed a Psychiatric Review Technique Form (PRTF) on which she indicated that Plaintiff had (1) no restriction of activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation of extended duration. R. 412; *see* 20 C.F.R. § 404.1520a (evaluation of mental impairments). Dr. Cormier found that Plaintiff did not have a "severe" mental impairment. R. 414; *see* 20 C.F.R. § 404.1521 (defining when an impairment is not severe).

In the Notes section of the PRTF, Dr. Cormier observed that Plaintiff did not allege a mental disorder as a disabling impairment on the form that she completed when she filed for benefits, although Plaintiff reported treatment for "nerves" by her attending physician.  R. 177-184, 414.  Dr. Cormier further observed that Plaintiff's medical evidence of record indicated some anxiety and depression related to marital and health issues, but that no significant mental health issues were noted in her current attending physician's notes.  R. 414.  Dr. Cormier acknowledged that Plaintiff described herself as "super nervous" following her divorce and a home invasion several years ago, and that she described symptoms of PTSD, but that she demonstrated no significant depression or anxiety, and there was no clear history of symptoms of PTSD.  *Id.* Moreover, Dr. Cormier noted that Plaintiff demonstrated capability to perform significant activities of daily living, including caring for grandchildren from 7:00 a.m. to 5:30 p.m. daily while her family members worked.  *Id.*

On March 19, 2009, non-examining State agency physician Edward Holifield, M.D., opined that Plaintiff was capable of medium exertional activity with no other limitations.  R. 394-401.

### 4.  Evidence Subsequent to the Date Last Insured of June 30, 2009

On July 29, 2009, a second non-examining State agency physician David Guttman, M.D., completed a Physical RFC Assessment and opined that Plaintiff was capable of medium exertional activity with no other limitations.  R. 513-20.

On August 12, 2009, a second non-examining State agency psychologist J. Patrick Peterson, Ph.D., J.D., completed a PRT and opined that Plaintiff's mental impairment of affective and anxiety disorders were not severe.  R. 521, 524, 526, 531-

33.  Dr. Peterson found that Plaintiff had no restriction on activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of periods of decompensation.  R. 531.

In his Consultant's Notes section, Dr. Peterson indicated that prior to her date last insured in June 2009, Plaintiff's daily activities included shopping, food preparation, handling financial matters, local driving, babysitting a two-year-old grandchild, and at least two additional grandchildren ages nine and eleven on a daily basis, reading, and attending church.  R. 533.  Dr. Peterson further observed that Plaintiff had never sought, received, or been referred for any psychological treatment beyond provision of some mild medications by a non-psychiatrist treating physician to assist with pain management and general relaxation, and that the findings of the February 18, 2009, consultative examination by Dr. Carr did not indicate the presence of any diagnosable mental disorder beyond mild/moderate adjustment reaction and/or possible residual PTSD.  R. 533.

On September 26, 2009, Plaintiff received treatment at Madison County Memorial Hospital when she fell after taking "too many sleeping pills."  She denied taking anything other than four Neurontin, but was rambling, disoriented, and confused. She was noted to be "staying with an elderly lady" at the time of the incident.  R. 701-02. She was noted to have a benzodiazepine overdose that was possibly accidental. R. 703.

On September 26, 2009, Plaintiff was evaluated at the Apalachee Center on referral from hospitalization.  R. 638.  Plaintiff reported that she "accidentally" overdosed on Xanax, denied suicidal ideation and "can't explain how she took excess of pills."  She

reported being depressed since her husband left her. R. 638. Plaintiff was observed to

fidgety and anxious, but provided a summary of her past treatment for prescription

abuse. R. 642. She reported she did not intend to overdose but was "really stressed"

by having to be the primary caretaker of her mother-in-law, and she "took too much

Xanax by mistake." She was noted to have no withdrawal symptoms, but was admitted

for safe detoxification from Xanax. R. 643-47. Plaintiff's insight and judgment were

noted to be "fair," memory adequate, and oriented "0X3." R. 639. She was diagnosed

with Major Depression, Recurrent and Anxiety Disorder NOS with a Global Assessment

of Functioning (GAF) score of 50.[4] Xanax was not prescribed, but Paxil was continued

and Ativan was prescribed. R. 638-39. The following morning, Plaintiff reported feeling

---

[4] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners. The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id. See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale). A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a global measure of disability, the WHO DSM-5 (see the chapter "Assessment Measures")." DSM-5 at 16.

"good" and repeated that she had not planned to overdose. She was found to have no major mood disorder and was discharged. R. 640.

On October 6, 2009, Plaintiff's daughter called the MCHD stating that she had called 911 and had the Plaintiff taken to the emergency room on September 25 after she took 5 Xanax pills and "passed out a friend's house." Plaintiff was reported to be in a three-day detoxification program (at Apalachee Center) and then an outpatient program at Bridges of Hope. R. 553; *see* R. 636-40. On or about October 6, 2009, the daughter provided a letter to the clinic and Dr. Campbell expressing concern regarding "the amount of medication has been prescribed to my mom" and that she had been hiding medication from her because of "the abuse or over medicating." R. 561. The daughter wrote, "I have had to miss work due to the fact that my mom has over medicated herself and she was unable to take care of my daughter. I do realize that my mom does have medical issues and that she may need some of the medications provided, but my mom is also an addict and I also know she is a good story teller." Finally, she stated, "what I'm asking is that you consider the dosage and the amount per month that you are prescribing." *Id.* In a handwritten note responding to the daughter's letter, Dr. Campbell stated he reviewed Plaintiff's medication list and it is "not excessive if she is not getting meds somewhere else, although using in excess may be [a] problem, will discuss at next [illegible]." *Id.* He further noted that he called the daughter and explained he could not discuss specifics of her case; however, he recommended she "talk to her mom and come in at next [appointment] to address together. Also told her that if she is concerned about the care of her daughter (patient's granddaughter) to not let her take care of her." *Id.*

On October 19, 2009, Plaintiff returned to the clinic for follow-up on her anxiety, reporting she had completed detox therapy and was no longer taking narcotics or Benzodiazepines, and did not want them anymore.  The treating physician discussed his concerns with her, and Vistaril and Paxil were prescribed as new medications for anxiety.  R. 551-52.

On November 23, 2009, Plaintiff sought treatment at the MCHD because of swelling of the left arm.  Slight edema was found on examination, and it was deemed secondary to neuropathy and the prior injury.  Neurontin 300mg was continued.  R. 549, 551; *see* 670-72.

On December 16, 2009, Plaintiff was seen at the MCHD for left arm pain, fatigue, difficulty sleeping at night, and a lot of anxiety.  Plaintiff was taking 10 mg of Paxil, which was doubled.  The left arm pain was attributed to neuropathy, and a referral was made to the original orthopedic surgeon for further evaluation.  R. 536.  Plaintiff continued receiving Neurontin for pain and Vistaril for anxiety through the MCHD through July 2010.  R. 547-48.

On December 29, 2009, Plaintiff sought treatment for kidney stone pain, and was noted to have a long history of nephrolithiasis with current stones.  R. 667.

On January 6, 2010, Plaintiff sought treatment for kidney stones causing flank pain, urinary frequency, and nausea.  She was given injections of Demerol and Phergan for pain and nausea, and was also prescribed promethazine for nausea.  R. 581-83.  On January 13, 2010, Plaintiff was prescribed Phenergan for nausea and Lortab for pain due to kidney stones.  R. 580.  On January 21, 2010, Plaintiff sought treatment for kidney stones causing flank pain, urinary frequency, and nausea.  A Demerol injection

was provided.  R. 571-72.  A January 29, 2010, kidney stone manipulation procedure was cancelled due to Plaintiff's inability to pay.  R. 569.  On June 4, 2010, bilateral nephrolithiasis was found (kidney stones in kidneys and urethra, bilaterally) with at least four stones in each kidney.  R. 655.

On July 6, 2010, Plaintiff had her first face-to-face evaluation with Apalachee Center psychiatrist, Phillip W. Cushman, M.D.  R. 540-42.[5]  Dr. Cushman's notes reflect a comprehensive medical and personal history of Plaintiff.  *Id.*  Plaintiff complained of "nerves" and "being phobic around people."  R. 542.  She informed Dr. Cushman of her history of divorce and the assault, with the subsequent development of difficulty leaving the house, feeling extremely tense, anxious, and having exaggerated startle responses and avoiding thinking or talking about the assault.  *Id.*  Plaintiff reported difficulty falling asleep, staying asleep, and concentrating.  Plaintiff was taking Paroxetine and Neurontin, but had run out of both due to lack of money and felt 40 mg of Paroxetine had not been effective.  Plaintiff also informed Dr. Cushman of being admitted to PATH 2-3 times for detoxification.  She reported having major problems with taking Ativan, Xanax, and narcotic pain medication, but had not taken anything like that in a number of months.  R. 542.  Plaintiff had "no disturbance of thought or speech."  Dr. Cushman noted that Plaintiff was friendly and cooperative, but very nervous and "visibly somewhat shaky" with an anxious affect.  R. 541.  In his clinical assessment, Dr. Cushman noted that Plaintiff's anxiety caused her to have difficulty recalling answers on occasion, such as when she "blocked" and could not remember who the current president was for several minutes.  R. 541.  Intelligence functioning appeared

---

[5] Plaintiff testified she starting seeing Dr. Cushman in September 2010.  She was mistaken.  R. 37, 45.

average; insight and judgment were intact; and she was able to care for her basic needs. *Id.* Dr. Cushman diagnosed Panic Disorder with Agoraphobia, PTSD, a history of prescription drug abuse, and noted a GAF score of 40. R. 540; *see supra* n. 4.

Dr. Cushman noted PTSD symptoms including Plaintiff's attempting to avoid thinking about the assault, but also noted that Plaintiff "finds herself drawn back to it when she walks by someone who is a heavy smoker and recognizes the smell of tobacco on his body and in his hair as they struggled on that occasion." R. 540. He opined that Plaintiff had "the classic symptoms of [PTSD] and the classic symptoms of Panic Disorder with Agoraphobia." He prescribed Mirtazapine at bedtime and Fluoxetine in the morning in the attempt to "build up some anti-panic [effects] as well as improve some of the symptoms of her PTSD." *Id.* However, he noted, "she very badly needs counseling and needs to talk about this…and not keep it inside." *Id.* Plaintiff was to return in two months. Plaintiff was told it was important for her "to tolerate the medications and to take them on a daily basis." Dr. Cushman requested an annual lab protocol. *Id.*

On August 24, 2010, bilateral nephrolithiasis was noted with five kidney stones noted in the right kidney, as well as urethral dilation due to present or recent passage of gravel. R. 653. On August 27, 2010, Plaintiff was again evaluated with a CT urogram, which revealed bilateral nephrolithiasis. R. 651.

On August 31, 2010, Dr. Cushman saw Plaintiff for a face-to-face, half-hour medication management visit. R. 539. He noted that Plaintiff's sleep had improved somewhat, but not as well as she should. *Id.* Plaintiff was no worse; the only side effect was significant weight gain since she went on Mirtazapine. *Id.* Plaintiff reported

her anxiety level was high and she continued to have panic attacks, although not as severe as prior to starting Fluoxetine. *Id.* Mirtazapine was replaced with Trazodone even though it would not be as effective in some other respects. Plaintiff would continue taking Fluoxetine each day. Dr. Cushman opined, "[b]ecause of her combined problems of Panic Disorder and [PTSD], I think she is going to be a more difficult treatment [sic] than if she had one or the other." He instructed Plaintiff to return in three months because he would be out of the office part of the time. *Id.* (Plaintiff reported being in an automobile accident and she totaled her car. She was life-flighted to Tallahassee. Her only serious injury was a fracture of one of the bones around her left orbit. *Id.*)

On September 22, 2010, Dr. Cushman completed a Mental Residual Functional Capacity Checklist. R. 634-36.[6] He opined that Plaintiff had multiple "marked" and "moderate" limitations, and that her condition was chronic and tended to be worsened by stress. He opined that his responses would not change even if Plaintiff had only minimal contact or interaction with others. *Id.* He noted that Plaintiff's impairment had lasted or was expected to last 12 months or more. R. 635. Finally, on October 7, 2010, Dr. Cushman provided a letter stating that the limitations noted on the September 2010 checklist "have existed since at least 2005." No further explanation is provided. R. 732.

---

[6] The ALJ found (referring to Exhibit 20F-checklist, R. 634-36) that Plaintiff began treatment with Dr. Cushman in September 2010. R. 24. The record reflects, however, that the first evaluation was on July 6, 2010, and first medication management visit was on August 31, 2010. R. 539-42; *see* R. 45-46 (Plaintiff testified that she first saw Dr. Cushman in September 2010 and saw him two or three times.)

**C.  Substantial evidence does not support the ALJ's determination that Plaintiff does not have a severe mental impairment affecting her ability to work nor does it support the ALJ's credibility determination of Plaintiff**

At step 2, the issue is whether the claimant has shown that he or she has a condition that has more than "a minimal effect on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc." Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  To be considered "severe," a medical condition must constitute more than a "deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). "[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), *citing* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild. . . .Claimant need show only that her impairment is not so slight and its effect is not so minimal." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).  It was been said that step two of the sequential analysis may do no more than screen out de minimus claims. Stratton v. Bowen, 827 F.2d 1447, 1453 (11th Cir. 1987).[7]

At step two, the ALJ determined that Plaintiff had several severe impairments: "lupus, residuals of gunshot wound to the right upper extremity, and a history of kidney

---

[7]  The ALJ is not required, however, to identify all of the impairments that should be considered severe. *See* Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 825 (11th Cir. 2010)

stones."[8]  R. 20.  The ALJ concluded that through June 30, 2009, Plaintiff's "medically

determinable physical impairments are severe in nature because they significantly

limited the claimant's ability to perform basic work activities."  R. 20.  The ALJ did not

address the impacts of Plaintiff's left upper extremity impairments and her ongoing

problems with kidney stones.

The ALJ also found at step two that Plaintiff's "medically determinable

impairments of affective disorder and anxiety related disorder, considered singly and in

combination, did not cause more than a minimal limitation in the claimant's ability to

perform basic mental work activities and were therefore nonsevere."  R. 21.  In reaching

this conclusion, the ALJ stated he considered the four broad functional areas in the

paragraph B criteria in Listing 12.00C, and ultimately determined that Plaintiff had *no*

limitation in activities of daily living; *mild* limitation in social functioning and

concentration, persistence or pace; and *no* episodes of decompensation which have

been of extended duration.  R. 21.  The ALJ does not refer to evidence under this

section of his decision.  The ALJ correctly stated that the limitations identified in the

paragraph B criteria are not an RFC assessment, but are used to rate the severity of

mental impairments at steps two and three.  R. 20-21.

The ALJ determined that Plaintiff had the RFC to perform the full range of

medium work.  R. 22.  It was at this stage of his analysis that the ALJ expressly

considered the medical and other evidence.  R. 23-24.  As noted above, the ALJ found

that Plaintiff had no severe mental impairment and, as a result, included no mental

limitations in his RFC limitations.  The ALJ ultimately determined at step four that

---

[8]  Plaintiff's *left* upper extremity was injured, not her *right* as found by the ALJ.
R. 225-27.

Plaintiff was capable of performing her past relevant work as a purchasing clerk that, according to the ALJ, "did not require the performance of work related activities precluded by [Plaintiff's RFC]." R. 24.

According to Plaintiff, the ALJ's RFC determination, which is predicated on the ALJ's analysis of the evidence, begs the question as to whether Plaintiff has a severe mental impairment, such as PTSD based on Dr. Cushman's patient notes and part of Dr. Carr's opinion, a finding not made at step two, which precluded her from performing her past relevant work. For Plaintiff, the problem here is that the ALJ did not address and consider all of the Plaintiff's mental health history in evaluating Plaintiff's RFC or at step four when he determined Plaintiff was capable of performing past relevant work.

Relevant here, the record indicates that Plaintiff began her medical examinations and treatments in and around 2003 (and perhaps in 1986 according to Plaintiff, R. 41) with Dr. Szczesny, a rheumatologist, when Plaintiff came in for a follow-up of her chronic pain and fibromyalgia. R. 238, 468. In 2004, Plaintiff suffered a home invasion and received a gunshot wound to her left arm. R. 225-27. In December 2004 and January 2005, Plaintiff received treatment at the MCHD for severe depression and insomnia. R. 432. Marital problems were described at this time. *Id.*

Plaintiff was treated by Dr. Szczesny for various physical and mental ailments, including numbness in her first three fingers following the gunshot wound, R. 234; fibromyalgia, lupus, stress, panic attacks, and depression, R. 232-38, 463-64. Plaintiff was concurrently treated at the MCHD for similar problems, including depression and insomnia, and was prescribed medication. R. 374-82, 432-56. In May 2005,

Dr. Szczesny opined that Plaintiff had "a chronic underlying depression that is probably more serious than we realize, and certainly more deeply rooted." R. 232, 463. Various medications were prescribed such as Lexapro for depression. R. 436, 438.

There were times when Plaintiff reported doing better such as in November 2007, Plaintiff was taking Paxil three times daily for anxiety and instructed to decrease her dosage to twice daily. She was also taking Xanax for anxiety--it worked well--and Plaintiff felt very well. R. 444, 446; *see* R. 456 (treatment at MCHD for myalgias and anxiety).

Kidney stones became a problem beginning in and around May 2008 and continued almost monthly thereafter until on or about June 2010. R. 243-53, 262-354, 369-73, 383, 417-29, 486-98, 508-12, 569, 571-72, 580-83, 595-613, 618-22, 655, 667, 710-15, 721.

The ALJ does not expressly discuss Plaintiff's medical history. R. 23-24. Rather, the ALJ begins his discussion of the medical evidence with Dr. Dulay's February 17, 2009, independent medical examination, followed by Dr. Carr's February 18, 2009, independent psychological examination, a brief discussion of findings from State agency medical consultants, Drs. Holifield and Gutman, and State agency psychological consultants, Drs. Cormier and Peterson. R. 23. The ALJ gives significant weight to the opinions of Drs. Dulay and Carr and to the medical consultants Drs. Holified, Guttman, Cormier, and Peterson. R. 24

In his decision, the ALJ affords Dr. Cushman's September 22, 2010, checklist two brief paragraphs. R. 23-24. The ALJ does not "give significant weight" to his checklist/findings because the checklist does not "cite any objective medical evidence of

record to support the checklist's findings and conclusions.  Further, the claimant's date

last insured is June 30, 2009, and she did not begin treatment with Dr. Cushman until

September 2010 (Exhibit 20F)."  R. 24; *see supra* n.6.

Plaintiff was evaluated by Dr. Cushman on July 6, 2010.  Plaintiff had a

medication management visit with Dr. Cushman on August 31, 2010.  R 539, 542.  The

ALJ did not refer to these notes.  After the administrative hearing, on October 7, 2010,

Plaintiff's counsel furnished the Office of Disability Adjudication and Review with

Dr. Cushman's October 7, 2010, letter stating that the limitations noted on the

September 2010 checklist "have existed since at least 2005," although no explanation is

provided.  R. 731-32.  The ALJ did not refer to this letter in his October 19, 2010,

decision.  R. 23-25.

As noted by the ALJ, Dr. Carr assigned Plaintiff the Axis I diagnosis of PTSD.

R. 23, 392.  Dr. Carr also made numerous findings that are not favorable to Plaintiff.

R. 23, 389-92.  In addition to the PTSD diagnosis, Dr. Carr indicated that Plaintiff was

likely to need continuing psychiatric treatment.  Dr. Carr also indicated that Plaintiff's

hypervigilance was quite serious, but her symptoms were moderate.  R. 392.  The ALJ

accorded "significant weight" to Dr. Carr's opinion because it was supported by the

record as whole and he was an examining psychologist.  R. 24.

Notwithstanding the opinions of Drs. Carr, Peterson, and Cormier regarding

Plaintiff's mental status, the evaluation and medication management notes of

Dr. Cushman, even considering the limited number and timing of the visits, cannot be

overlooked especially given the ALJ's rather brief references to *only* Dr. Cushman's

checklist.  R. 23-24.  The ALJ gave no significant weight to Dr. Cushman's checklist

opinions without any express consideration of Dr. Cushman's patient notes in light of the medical evidence pre- and post-dating the date last insured.

The Court is concerned with the brief and rather late entry (over one year after Plaintiff's date last date insured) of Dr. Cushman into Plaintiff's medical history.[9]  <u>Doyal</u>, 331 F.3d at 762-63.  But, he is not the first medical source to note Plaintiff's depression, anxiety, and PTSD.  At the very least, Dr. Cushman offered an examining medical source opinion that should have been expressly considered in light of the factors set forth in 20 C.F.R. § 404.1527(c) and all of the record medical evidence.  The fact that his opinions were rendered after the date last insured is not dispositive given the documented existence of several mental impairments *prior* to that time.  <u>Singletary</u>, 798 F.2d at 821-22.

Based on the foregoing, the ALJ's findings at step two (and his step four and determinations) are flawed and should be reversed and remanded for further consideration of Dr. Cushman's opinions in light of all the evidence.  In addition, the Commissioner should contact Dr. Cushman and other medical sources, including Dr. Carr, if necessary for any additional opinions and treatment notes and explanations, if any, he or they may have regarding Plaintiff's mental status and any impacts on Plaintiff's ability to work.

Finally, the ALJ found Plaintiff to be "a less than fully credible witness.  In terms of the claimant's allegations, the objective medical reports of treating and examining practitioners as well as specific findings made on clinical examinations and evaluations

---

[9]  It is uncertain why Plaintiff was not referred to Dr. Cushman until July 2010, well after her accidental Xanax overdose in September 2009.  R. 539-42, 638, 701-03.  In August 2010, Plaintiff received some limited counseling from Dr. Cushman in addition to pharmacological management.  R. 539-42; *see* R. 45-46.

do not support the level of impairment severity alleged by the claimant."  R. 24.  Plaintiff

argues that the ALJ's credibility of determination of Plaintiff was unexplained and

unsupported by substantial evidence.  Doc. 19 at 22-24.  The ALJ refers briefly to

Plaintiff's hearing testimony and rather cryptically finds that she is less than a fully

credible witness.  R. 24.  The ALJ does not provide any further information regarding

why Plaintiff is not a credible witness.  The ALJ's credibility determination is too vague

and is also reversed and remanded for further consideration.  *See* Soc. Sec Ruling 96-

7p.

      Based on the foregoing and the recommendation made herein, it is unnecessary

to decide the other issues presented by Plaintiff.  No decision is made regarding

whether Plaintiff has a severe mental impairment or may be entitled to DIB benefits.

## V.  Conclusion

      Considering the record as a whole, the findings of the Administrative Law Judge

were not based upon substantial evidence in the record and he did not correctly follow

the law.  Accordingly, it is respectfully **RECOMMENDED** that the decision of the

Commissioner to deny Plaintiff's application for DIB be **REVERSED** pursuant to

sentence four of 42 U.S.C. § 405(g) and **REMANDED** for further proceedings.

      **IN CHAMBERS** at Tallahassee, Florida, on July 23, 2013.


                 **s/  Charles A. Stampelos**
                **CHARLES A. STAMPELOS**
                **UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.